**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CG3 MEDIA, LLC and COREY
GRIFFIN,

               Plaintiffs / Counter-Defendants,

        -v-

BELLEAU TECHNOLOGIES, LLC,


               Defendant / Counter-Plaintiff.

Civil Action No. 1:21-cv-04607-MKV

**BELLEAU TECHNOLOGIES, LLC'S
OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page

I.    Overview of the '646 Patent ...................................................................................1

    A.    Summary of '646 Specification ........................................................................1

    B.    '646 Claims ....................................................................................................3

II.   Relevant Legal Standards ......................................................................................4

    A.    The Purpose of Claim Construction..................................................................4

    B.    Claim Construction .......................................................................................5

III.  Disputed Claim Terms ...........................................................................................7

    A.    "a processor"................................................................................................7

    B.    "storing, via a processor…retrieving, via said processor… generating, via said processor…comparing, via said processor…altering, via said processor…determining, via said processor…determining, via said processor…altering, via said processor." ...........................................................9

    C.    "a memory device of a computer" ...................................................................14

    D.    "storing…in a memory device of a computer…displaying…on the display screen of said computer"..............................................................................15

    E.    "text file" ...................................................................................................18

    F.    "hypothesis words" .....................................................................................19

    G.    "altering, via said processor, said predetermined number of artifact words utilized for comparing to said predetermined number of hypothesis words" .......22

IV.   Conclusion .......................................................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
    687 F.3d 1292 (Fed. Cir. 2012) ................................................................................. 13, 16

*Baldwin Graphic, Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) .............................................................................. 11, 12, 15

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015) ................................................................................. 20

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) ................................................................................. 10, 16

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
    838 F.3d 1224 (Fed. Cir. 2016) ................................................................................. 20

*Enzo Biochem*, Inc. v. *Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010) ................................................................................. 20

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*,
    350 F.3d 1327 (Fed. Cir. 2003) ................................................................................. 5

*Gesture Tech. Partners, LLC v. Huawei Device Co.*,
    2021 WL 4760632 ....................................................................................................... 20

*Golden Bridge Tech., Inc. v. Apple Inc.*,
    758 F.3d 1362 (Fed. Cir. 2014) ................................................................................. 5, 10

*Hand Held Prods., Inc. v. Amazon.com, Inc.*,
    C.A. No.: 12-768-RGA-MPT (D. Del. June 24, 2014) .................................... 12

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ................................................................................. 10

*Implicit, LLC v. NetScout Sys., Inc.*,
    No. 2:18-CV-53-JRG, Dkt. No. 111 (E.D. Tex. Apr. 15, 2019) ..................... 12

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ................................................................................. 6

*Nautilus, Inc. v. Biosig Instruments*,
    572 U.S. 898, 901-02, 909-10 (2014) ...................................................................... 19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................................. 4, 5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................................... 5, 6, 9, 17

*Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ................................................................................... 6

*Renishaw PLC v. Marposs Societa' Per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ................................................................................... 6

*SanDisk Corp. v. Kingston Tech. Co., Inc.*,
  695 F.3d 1348 (Fed. Cir. 2012) ................................................................................. 12

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ................................................................................. 22

*Soter Techs., LLC v. IP Video Corp.*,
  C.A. No. 20-cv-2989-GRB-AKT, D.I. 89, Slip Op. (Oct. 5, 2021) .................................... 5

*Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc.*,
  743 F.3d 1359 (Fed. Cir. 2014) ................................................................................. 20

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ................................................................................. 10

*Transocean Offshore Deepwater Drilling, Inc. v. Stena Drilling Ltd.*,
  CIVIL ACTION No. H-08-3287, Dkt. No. 115 .............................................................. 12

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ................................................................................... 4

*Versa Corp. v. Ag-Bag Int'l, Ltd.*,
  392 F.3d 1325 (Fed. Cir. 2004) .............................................................................. 9, 17

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................................. 6, 8

**Statutes**

35 U.S.C. § 112 ............................................................................................................ 19

Belleau Technologies, LLC ("Belleau" or "Counter-Plaintiff") respectfully seeks constructions consistent with the plain meanings of the terms of U.S. Patent No 9,953,646 (the "'646 Patent") (attached hereto as Ex. 1) and their use in the patent.  The '646 Patent is directed to a novel teleprompter system that uses dynamic speech recognition to automatically track a speaker's position in a prewritten script while reading. Through Belleau's novel system a user can speak at her own pace and have the teleprompter present text in accordance with the user's speech.  The terms of the '646 Patent relate to this method and recite its features of operation.

Because their accused product infringes under any reasonable construction of the claims, Counter-Defendants CG3 Media, LLC and Corey Griffin ("CG3" or "Counter-Defendants") conjured a group of contrived positions that have no connection to the plain meaning of the claim language or the teachings in the specification.  Because these "constructions" are contrary to the law and are not supported by evidence, they should be rejected as they are designed solely to enable CG3 to avoid liability for ongoing infringement.  As set forth in greater detail below, Belleau respectfully asks the Court to follow its proposed constructions and to reject the Counter-Defendants' proposals.

I.     **OVERVIEW OF THE '646 PATENT**

   A.     **Summary of '646 Specification**

The '646 Patent is directed to a "computer-implemented method for dynamically presenting a prewritten text in a graphical user interface." Ex. 1 at abstract.  Particularly, the '646 Patent addresses the problem of prior art teleprompter systems.  The '646 Patent notes that prior art teleprompters "normally scroll through the script manually as chosen by a speaker" or scroll at a constant rate.  "When a teleprompter is set at a constant rate the reader may fall behind the script and get lost or may read faster than the script and have to wait for the script to catch up" or if the speaker "moves the script manually and the speaker goes off script for a period of time, the

1

speaker may forget to progress the script when the speaker goes back on script." *Id.* at 1:24-32.

The '646 Patent attempts to address this problem with a "computer-implemented method for dynamically presenting a prewritten text in a graphical user interface." *Id.* at 1:49-51. Particularly, the '646 Patent includes "a method and system utilizing speech recognition to locate a specific location in a prewritten script (also known as a text artifact)." The method of the '646 Patent can further provide for "graphically presenting a section of the prewritten script to a user." *Id.* at 4:5-9.  In the disclosed system the "speaker's place may be highlighted or otherwise shown in a distinctive manner." *Id.* at 4:14-15. "In the preferred embodiment a small section of the prewritten script before this location is displayed and a small portion of the prewritten script after this section is displayed." *Id.* at 4:14-18.

Figure 5 of the '646 Patent illustrates a high-level overview of one of the disclosed embodiments.



Ex. 1 at Fig. 5.

As described in Figure 5, in the disclosed embodiment the system in step 200 stores a "text artifact" such as the speech to be used in the teleprompter and read by a user. Ex. 1, 6:38-50. The system in step 202 then receives vocal input in the form of the person speaking or performing the speech that is being recited. *Id.*  In step 204 the system processes the vocal input received in step 202 through a speech to text conversion process and generates a "hypothesis" of words spoken by the speaker (*i.e.* potential words that the system believes were spoken). In step 206 the system refines the hypothesis by removing words that have previously been matched during a previous portion of the speech (*e.g.*, if the user is at a later portion of the speech earlier words can be removed from consideration when performing the comparison).[1]  *Id.* In step 208 the system compares the hypothesis words generated from the user's speech to words in the text artifact (*i.e.* the teleprompter text).  In step 210 the system matches one of the spoken hypothesis words to the text artifact and then moves the scrolling teleprompter text to the appropriate location. *Id.*  Through this innovative system a teleprompter can automatically scroll along with a user's voice.

Additionally, as described in greater detail below, the innovative method of the '646 Patent is intentionally hardware-agnostic, allowing for the claimed method steps to be spread across multiple computers.

**B.     '646 Claims**

The '646 Patent includes four independent claims and sixteen dependent claims. Independent claim 1, which is the only independent claim currently asserted, is set forth below, with the terms in dispute bolded.

A computer-implemented  method  for  dynamically  presenting  a  prewritten  text  in  a

---

[1] This feature is not recited in independent claim 1 but is recited in dependent claim 6.

graphical user interface comprising

a) receiving a text artifact, said text artifact containing a plurality of artifact words;

b) **storing, via a processor**, said text artifact in a memory device of a computer;

c) **retrieving, via said processor**, said text artifact;

d) displaying said text artifact on the display screen of said computer;

e) receiving a vocal input;

f) **generating, via said processor, a text file** representing the words spoken in said vocal input, said text file containing a plurality of **hypothesis words**;

g) **comparing, via said processor**, a predetermined number of said hypothesis words to a predetermined number of said artifact words;

h) determining a match location in said text artifact where a specific number of said predetermined number of hypothesis words match a specific number of said predetermined number of artifact words;

i) **altering, via said processor**, the display on said display screen to display said match location on said display screen of said computer;

j) **determining, via said processor**, the font size of the text of said text artifact as displayed on said display screen;

k) **determining, via said processor**, the orientation of the electronic screen displaying the text of the text artifact;

l) **altering, via said processor**, **said predetermined number of artifact words utilized for comparing to said predetermined number of hypothesis words**.

## II.     RELEVANT LEGAL STANDARDS

### A.     The Purpose of Claim Construction

Claim construction rulings are used to instruct the jury on the scope and meaning of the allegedly infringed claims. When parties have a "fundamental dispute regarding the scope of a claim term" the Court must resolve the disputed issue. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). However, a Court need not "repeat or restate every claim term." *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.

4

Cir. 1997); *see also Beyond Innovation*, 521 F.3d at 1360 (trial judges are "not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims").

    **B.**    **Claim Construction**

Claims are construed according to their ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of invention and in view of the relevant evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *Soter Techs., LLC v. IP Video Corp.*, C.A. No. 20-cv-2989-GRB-AKT, D.I. 89, Slip Op. at 3 (Oct. 5, 2021); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (claim terms "are examined through the viewing glass of a person skilled in the art").

"Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history . . . .  There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc*., 758 F.3d 1362, 1365 (Fed. Cir. 2014) (citations and quotations omitted).

Two different forms of evidence are considered during claim-construction: intrinsic evidence, which consists of the claims, specification, and prosecution history; and extrinsic evidence, which comprises materials that are not part of the asserted patent's public record. *Phillips*, 415 F.3d at 1314-17 (*en banc*).  As the Federal Circuit has repeatedly confirmed, the intrinsic record is given priority in the analysis. *Id.* at 1317.  In general, the first step in the analysis is to consider the language of the patents' claims (both asserted and unasserted). *Id.* at 1314.  Next, the analysis focuses on the specification of the relevant patent. *Id.* at 1315-17. And the final component of the intrinsic record is the prosecution history, which comprises the back-

and-forth between the patent applicant and the Patent Office. *Id.* at 1317.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp*., 415 F.3d at 1313 (Fed. Cir. 2005). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). When relying on a specification for context in claim construction, however, care must be taken *not* to import limitations from the specification into the claims. *Phillips*, 415 F.3d at 1319-20.

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Once it is understood what was invented and what the inventors *intended* to envelop with the claim, then a proper interpretation of the disputed claim can be determined. *See id.* (*citing Markman v. Westview Instruments, Inc*., 517 U.S. 370, 389 (1996)).

In addition, district courts are "authorized . . . to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317-18. Although courts may admit extrinsic evidence, persuasive intrinsic evidence controls. *Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("While helpful, extrinsic sources like expert testimony cannot overcome more persuasive intrinsic evidence.").

## III.     DISPUTED CLAIM TERMS

### A.     "a processor"

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| "one or more computing devices, used either alone or in combination, where the computing devices include, without limitation, processors, microprocessors, general purpose processors, conventional processors, digital signal processors, controllers, microcontrollers, or state machines." | Plain and ordinary meaning |

Belleau's proposed construction draws directly from the specification and from controlling legal precedent to show that "a processor" refers to a plural, modular system of one or more processors spread across multiple computing devices. CG3, however, seeks to improperly narrow the claims to a single computer. To date, CG3 has provided only conclusory arguments and has yet to substantiate any evidentiary basis to support their illogical proposals. Particularly, CG3 has not articulated why it opposes a construction of "a processor" that includes the exemplary devices identified in the specification. It is unclear what CG3's objections stem from other than a self-serving desire that the claims mean something other than what is explicitly provided for by specification teachings and legal precedent.

The '646 Patent teaches a device-agnostic method, in which the claimed functions can be performed by multiple devices. Belleau has proposed constructions consistent with the specification of the '646 Patent, in which the "processor" can include multiple distributed devices and the functions performed by the "processor" can be distributed across multiple devices.  CG3, through its construction of this term and the following "storing, via a processor" term, asserts that the claims require all steps to be performed by a single device. CG3's constructions are a litigation-driven contrivance that have no support in either the specification or the claims.

The '646 Patent begins by establishing that the functions of the claimed invention can be performed by any number of devices and is not limited to particular hardware, noting:

> The hardware used to implement the various illustrative logics, logical blocks, modules, and circuits described in connection with the aspects disclosed herein may be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic device, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein.

Ex. 1 at 14:65-15:7.  Accordingly, the '646 Patent describes a wide range of structures that can perform the claimed method.  The '646 Patent further explains what sorts of devices count as a "processor" in the context of the claimed invention.

> "A *general-purpose processor* may be a microprocessor, ***but, in the alternative, the processor may be any*** conventional processor, controller, microcontroller, or state machine. A processor ***may also be implemented as a combination of computing devices***, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration. Alternatively, some steps or methods may be performed by circuitry that is specific to a given function."

Ex. 1 at 15:7-16 (emphasis added).  Accordingly, the '646 Patent makes clear that the "processor" is not just a single microprocessor but can be any number of alternative devices and particularly may be combinations of devices working together.  Belleau's proposed construction — "one or more computing devices, used either alone or in combination, where the computing devices include, without limitation, processors, microprocessors, general purpose processors, conventional processors, digital signal processors, controllers, microcontrollers, or state machines"—is taken directly from the specification and accordingly is the correct definition. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

8

In addition, one of the principal canons of claim construction, namely claim differentiation, further confirms that the claim should not be limited as CG3 proposes. "The doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.'" *Versa Corp. v. Ag-Bag Int'l, Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (citation omitted). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314 (*citing Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)). Claim 18 specifically recites a "computer comprising a microprocessor" and that the processor in question performs the claimed steps. Ex. 1 at claim 18 (18:43-67). This narrower construction, which includes limitations not present in claim 1, further confirms the broader scope of claim 1, which is not limited to a single device.

Belleau's construction is consistent with the intrinsic evidence, as it is taken from the explicit guidance in the specification of the '646 Patent. Further, neither the plain meaning nor the use in the art contradict Belleau's proposed construction as it is commonplace for computer-implemented methods to utilize multiple computing devices to achieve desired functions. As will be explained in more detail *infra*, section III.B, the law is clear that references to objects by indefinite articles like "a" or "an" are by default construed in the plural. Belleau's proposed construction is consistent with this default rule, but CG3's proposal is not. Based on the foregoing, Belleau respectfully requests that the Court adopt its construction of "a processor".

> **B.     "storing, via a processor...retrieving, via said processor... generating, via said processor...comparing, via said processor...altering, via said processor...determining, via said processor...determining, via said processor...altering, via said processor."**

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| Plain and ordinary meaning | One or more processors, at least one of which must implement the "storing"; "retrieving"; "generating"; "comparing"; "altering"; |

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| | "determining"; "determining"; and "altering" functions. |

The dispute involving this claim term relates to the claimed method steps performed by a recited processor in the claims. CG3 does not dispute that all of the claimed steps are self - explanatory and require no additional explanation beyond their plain and ordinary meaning. Rather CG3 seeks to add an ***additional*** and ***unrecited*** limitation that the claims ought to require that a single device perform all of the claimed steps of the claimed invention. CG3's proposed construction contradicts the plain language of the claims and the specification and should be rejected.  In short, notwithstanding that the specification allows multiple devices to perform different steps of the claimed method, and notwithstanding that the claims recite no such limitation, CG3 nevertheless asserts a contradictory proposal that would require a *single* device perform each and every one of the claimed steps.

CG3's proposed construction violates the "'heavy presumption' that a claim term carries its ordinary and customary meaning."  *CCS Fitness, Inc. v. Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (internal citations omitted). And CG3 cannot meet the high burden to show that the patentee acted as lexicographer or clearly disavowed claim scope. *Golden Bridge Tech., Inc* 758 F.3d at 136; *Hill-Rom Servs., Inc. v. Stryker Corp*., 755 F.3d 1367, 1371 (Fed. Cir. 2014) (recognizing the "heavy presumption" favoring term's ordinary meaning and stating that "[w]e depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal. The standards for finding lexicography and disavowal are exacting."); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-1366 (Fed. Cir. 2012) (plain and ordinary meaning unless "exacting" standards are met.)

As set forth above, the '646 Patent is hardware-agnostic and explicitly indicates that a "processor" includes, but is not limited to, multiple devices working together.

> "A **general-purpose processor** may be a microprocessor, **but, in the alternative, the processor may be any** conventional processor, controller, microcontroller, or state machine. A processor *may also be implemented as a combination of computing devices*, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration. Alternatively, some steps or methods may be performed by circuitry that is specific to a given function."

Ex. 1 at 15:7-16 (emphasis added).

The '646 Patent *further* reiterates explicitly that references to devices in the singular should not limit the claims.

> "[A]ny reference to claim elements in the singular, for example, using the articles "a," "an" or "the" is not to be construed as limiting the element to the singular."

Ex. 1 at 14: 46-49. CG3's proposed construction pays nominal lip service to a "one or more" construction and then promptly contradicts itself by requiring the same processor to perform certain functions, effectively imposing a single device limitation, in direct contradiction to precedent and the disclosures of the '646 Patent.

In addition to the disclosures in the '646 Patent, longstanding precedent holds that when construing patents with open-ended claims and a transitional "comprising" phrase, the indefinite articles "a" or "an" carry the meaning "one or more."

> "[T]his court has *repeatedly emphasized* that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising… That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are *extremely limited*: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'"

*Baldwin Graphic, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (emphasis added) (internal citations omitted). Belleau's claim 1 is an open-ended claim with a transitional

"comprising" phrase separating the preamble from the body of the claim, and thus this default rule of construction is applicable.

Exceptions to the default rule that "a" or "an" means "one or more" *only* arise where clear evidence exists that the language of the claims themselves, the specification, or the prosecution history **necessitate** a departure from the rule. *Baldwin*, 512 F.3d at 1343; *see also Implicit, LLC v. NetScout Sys., Inc.,* No. 2:18-CV-53-JRG, Dkt. No. 111 at *23 (E.D. Tex. Apr. 15, 2019) ("Defendants have failed to demonstrate that the claim language 'necessitate[s] a departure from the [one or more] rule.'") (*quoting Baldwin*); *Transocean Offshore Deepwater Drilling, Inc. v. Stena Drilling Ltd.,* CIVIL ACTION No. H-08-3287, Dkt. No. 115 at *60 (S.D. Tex. Oct. 27, 2014) ("In this case, the general rule in *Baldwin Graphic* and *TiVo* applies to the term 'a well.' The analysis begins with the construction that 'a well' means one or more wells. In this case . . . nothing in the claim language or the specification 'necessitate[s] a departure from the rule.'") (*quoting Baldwin Graphic Sys.*, 512 F.3d at 1343.); *Hand Held Prods., Inc. v. Amazon.com, Inc.*, C.A. No.: 12-768-RGA-MPT, at *14-15 (D. Del. June 24, 2014) ("Here, each of the claims-at-issue contain the open-ended transitional phrase 'comprising'; therefore implicating the general rule that 'a target' is not limited to being 'one.' There is no evidence that the patentee clearly intended to so limit the term. Nothing in the claims, specification, or prosecution history necessitate a departure from the rule.").

Deviating from the *Baldwin* rule and construing singular interpretations without sufficient evidence of a patentee's limiting intent is reversible error. *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1360-61 (Fed. Cir. 2012) (reversing lower court because, *inter alia*, it wrongly construed references to "the data portion" and "said data portion" as requiring singular constructions in lieu of the plural constructions required by the *Baldwin* rule); *Baldwin*, 512 F.3d

12

at 1342-1343 (Fed. Cir. 2008) (reversing the district court's erroneous construction of "said fabric roll" as a single fabric roll instead of one or more fabric rolls).

Further, to the extent that CG3 argues that the claim allows for multiple devices but that all of the steps must be performed by a single device, this approach has been repeatedly rejected by the Federal Circuit, which has reiterated that references to a disputed term in the claims with definite articles like "a," "its," "the," or "said" are insufficient evidence to warrant departure from a "one or more" construction. *01 Communique Lab., Inc. v. LogMeIn, Inc*., 687 F.3d 1292, 1296-97 (Fed. Cir. 2012) ("The patent's use of words such as 'a,' 'its,' and 'the' in the claims is insufficient to limit the meaning of 'locator server computer' to a single physical computer."). "The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general, plural [one or more] rule, but simply reinvokes that non-singular meaning." *Id.* (*quoting Baldwin*, 516 F.3d at 1342-43). Additionally, when a specification discloses the possibility of a modular configuration involving multiple computers or other components, that evidence requires a "one or more" construction. *See id.* ("More to the point, the specification also discloses expressly that 'Server Computer 12 may comprise one or more computers, as is well known.'").

The body of Belleau's asserted Claim 1 refers first to "a processor" in 1(b) and then with following "said processor" references. Controlling legal precedent and dispositive evidence in the specification establish that "a processor" refers to a modular system of "one or more processors" that could be implemented among various combinations of computing devices. *See supra* Section III.A. Moreover, existing precedent further establishes that subsequent references to a plural antecedent (such as "a processor") with words like "said" remain plural. *See 01 Communique* 687 F.3d at 1296-97 (Fed. Cir. 2012)

The Counter-Defendants would have the court construe the patent erroneously – their proposal is contrary to both law and evidence. They simply cannot substantiate their "singular" proposal with sufficient evidence or relevant case law. Therefore, Belleau respectfully asks the court to reject their narrowing proposal and to instead give the disputed terms their plain and ordinary meaning. Given the weight of the evidence in this case, Belleau respectfully asserts that as a matter of law any references to "a processor" or "said processor" carry with them the possibility of a pluralistic configuration among multiple computers. *See* Sections III.A, III.B, *supra.*

C.    **"a memory device of a computer"**

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| "one or more memory devices that are accessible to one or more computers" | Plain and Ordinary Meaning |

The '646 Patent recites a "memory" of a "computer device" device that stores the claimed "text artifact" (*e.g.* teleprompter text) that is used for controlling the scroll effect of the teleprompter.  Belleau seeks, consistent with the patent's disclosure, to construe the memory as "one or more memory devices that are accessible to one or more computers."

As described above, the '646 Patent expressly discloses that different components can perform distinct functions. CG3 alleges that the claims are limited to a single computer having a single memory. Belleau respectfully asks the court to follow the same authorities and the same analysis above for "a processor" in construing the term "a memory device of a computer."  As set forth with respect to the "processor" limitation, the '646 Patent specifically describes a modular arrangement in which the computing functions can be distributed across multiple devices.  Accordingly, because the functionality of the '646 Patent is distributed, the disclosed system may use memories that are not physically located within a particular computer, but are

nonetheless accessible to that computer.  As set forth *infra,* the broader recitation of claim 1 is contrasted with different claims in the '646 Patent that specifically recite that the memory is within a computer. *See* Section III.D, *infra.*

Additionally, the '646 Patent  specifically notes that "any reference to claim elements in the singular, for example, using the articles "a," "an" or "the" is not to be construed as limiting the element to the singular." Ex. 1 at 14:46-49.

Step 1(b) of Claim 1 recites "storing, via a processor, said text artifact in a memory device of a computer." *Id.* at 15:62-63. According to the precedent in *Baldwin* set forth above and the specific disclosures in the '646 Patent (Section III.B, *supra*), the terms "a memory device" and "a computer" should by default be construed as "one or more memory devices" and "one or more computers." Accordingly, "memory device of a computer" means "one or more memory devices that are accessible to one or more computers."

**D.      "storing…in a memory device of a computer…displaying…on the display screen of said computer"**

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Wherein the "storing…said text artifact"; "displaying said text artifact"; and "displaying…said match location" must all occur on the same computer. |

As set forth above, the claims of the '646 Patent recite various steps performed with a "computer," including storing the text artifact in a memory device, displaying a text artifact, and showing a match for the text artifact. *See* Section I.A, *supra.*  CG3 seeks to introduce an unrecited limitation to the claims that a single computer performs all of these steps. This approach is clearly contradictory to the claim language, the specification, and precedent explained above. Nothing in the plain language of the claims requires that all of the claimed steps be performed on a single computer. Thus, CG3 proposed construction again violates the

15

"'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness* 288 F.3d at 1366. However, beyond that heavy legal presumption, the specification of the '646 Patent further contradicts CG3's narrow construction.

The '646 Patent specifically discloses that the claimed functions can be spread across multiple processors and devices and certainly does not restrict the disclosed embodiment to a single computer that performs all of the claimed steps. See Section III.A, *supra.* Indeed, after the claimed method is described, the '646 Patent further emphasizes that the disclosed method is hardware-agnostic, noting:

> The various illustrative logical blocks, modules, circuits, and algorithm steps described in connection with the embodiments disclosed herein may be implemented as electronic hardware, computer software, or combinations of both. To clearly illustrate this interchangeability of hardware and software, various illustrative components, blocks, modules, circuits, and steps have been described above generally in terms of their functionality.

Ex. 1 at 14:50-57. The '646 Patent further emphasizes that any of the claimed structures can include multiple devices, noting "[w]ords such as "thereafter," "then," "next," etc. are not intended to limit the order of the steps; these words are simply used to guide the reader through the description of the methods. Further, any reference to claim elements in the singular, for example, using the articles "a," "an" or "the" is not to be construed as limiting the element to the singular." *Id.* at 14:43-49. Accordingly, CG3's proposed construction directly contradicts these disclosures because it requires that all steps be performed by a single "computer."

The law is clear that plural structures remain plural even when claims refer to them subsequently with words such as "a," "its" or "the" or "said." *See 01 Communique Lab,* 687 F.3d at 1296-97 ("The patent's use of words such as 'a,' 'its,' and 'the' in the claims is insufficient to limit the meaning of 'locator server computer' to a single physical computer…The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not

change the general, plural [one or more] rule, but simply reinvokes that non-singular meaning.")
Thus, as with previous limitations, terms like "a computer" or "said computer" recited in the
claims are by default plural and do not require that a single computer perform all of the claimed
steps.

Finally, claim differentiation further confirms that the claim should not be limited as CG3
proposes. "The doctrine of claim differentiation 'create[s] a presumption that each claim in a
patent has a different scope.'" *Versa Corp.*, 392 F.3d at 1330. (citation omitted). "Other claims
of the patent in question, both asserted and unasserted, can also be valuable sources of
enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (citing *Vitronics*, 90
F.3d at 1582). "Differences among claims can also be a useful guide in understanding the
meaning of particular claim terms." *Id.* (*citing Laitram Corp. v. Rexnord, Inc*., 939 F.2d 1533,
1538 (Fed. Cir. 1991)).

Independent claim 18 recites in the preamble that the claimed method is performed "on a
computer comprising a microprocessor, a visual display, and a nonvolatile memory unit." Ex. 1
at 18:45-46.  Accordingly, when drafting claim 18, the applicants specifically included that the
components were present together on a computer.  Asserted claim 1 includes no such limitation,
simply referring to "a processor" and "a memory" being utilized in the body of the claim, which
are by default construed pluralistically. *Id.* at 15:62-63. Accordingly, this difference in wording
creates a presumption that claim 1 is broader than claim 18. The Counter-Defendants would have
the court read into claim 1 limitations that simply are not there.

Thus, for the reasons set forth above, the Court should not import CG3's unrecited
limitations to the claims and should construe these terms according to their plain and ordinary
meaning.

E.    "text file"

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a collection of data that is treated as a unit by a file system" |

In the claims, a "text file" is created that represents "the words spoken in said vocal input, said text file containing a plurality of hypothesis words."  In short, when a user of the teleprompter speaks, the claimed invention generates a text file containing "hypothesis words" that are likely candidates for the spoken words.  These words are compared to "artifact words" *i.e.*, prewritten words in the text used for the teleprompter to determine what part of the prewritten words the user is currently speaking.

Belleau proposes that "text file" be construed in accordance with its plain and ordinary meaning. CG3 alternatively seeks to import a limitation not present in the claims or in the specification of the '646 Patent. Particularly, CG3 demands that the Court insert an interpretation that the text file "is treated as a unit by a file system."  CG3's position does not explain what constitutes a "file system" or what it means to "be treated by a unit" and accordingly makes the claim harder, not easier to understand.

The words "file system" do not appear anywhere in the claims of the '646 Patent.  Nor do the claims describe the text file being stored anywhere.  Accordingly, there is no support for CG3's claim that the text file is somehow limited by, or confined to, a collection of data stored or recognized by a file system.

Similarly, the specification of the '646 Patent does not in any way disclose that the "text file" is recognized or stored by a file system. The '646 Patent simply states that the "text file" is created by the claimed method and compared to the words in the text artifact (*e.g.* the written text). Ex. 1 at 2:56-66.

As described *supra*, the claimed method is a modular system that could be distributed among multiple computers or processors and is specifically not limited to any arrangement of software or hardware. *See* Section III.A, *supra*; *see also* Ex. 1 at 15:17-19 ("In one or more exemplary aspects, the functions described may be implemented in hardware, software, firmware, or any combination thereof.").  It would be entirely contradictory to this arrangement to require that the text file be specifically arranged in a unit that is processed by a "file system."

Accordingly, for the reasons set forth above, the Court should reject CG3's limiting construction.

F.      "hypothesis words"

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite. |

Consistent with the usage in the art, the '646 Patent describes that voice input is converted into "hypothesis words" - namely best guesses about the words likely to have been spoken. These hypothesis words are compared to the pre-written text artifacts (*i.e.* the teleprompter speech) to determine where the speaker is in her speech and move the teleprompter to the right place. Accordingly, Belleau proposes that "hypothesis words" be construed in accordance with the plain and ordinary meaning.  Because CG3 has refused to disclose the reasoning behind its indefiniteness positions, Belleau is forced to speculate as to CG3's specific arguments.  In any event, both the specification and the technological literature of the time establish hypothesis words as a well-understood term.  In any event, CG3 cannot meet the standard necessary to establish this term as indefinite.

Claim terms are presumed valid and CG3 bears the burden of proving any assertion of indefiniteness under 35 U.S.C. § 112 by clear and convincing evidence. *Nautilus, Inc. v. Biosig Instruments*, Inc., 572 U.S. 898, 901-02, 909-10 (2014) (citing 35 U.S.C. § 282); *see also*

*Gesture Tech. Partners, LLC v. Huawei Device Co*., Ltd., 2021 WL 4760632, at *4 (quoting *Sonix Tech. Co. v. Publ'ns Int'l, Ltd*., 844 F.3d 1370, 1377 (Fed. Cir. 2017)) (clear and convincing evidence must be presented by patent challenger to establish claims as indefinite). A claim is invalid for indefiniteness only when its language, read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. Definiteness "mandates clarity, while recognizing that absolute precision is unattainable." *Id*. at 910. "[T]he certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id*.; *see also Biosig Instruments, Inc. v. Nautilus, Inc*., 783 F.3d 1374, 1381 (Fed. Cir. 2015). "[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art" and in light of the relevant technology. *Nautilus*, 572 U.S. at 908. "[G]eneral principles of claim construction apply." *Enzo Biochem*, Inc. v. *Applera Corp*., 599 F.3d 1325, 1332 (Fed. Cir. 2010).

A claim is definite if a person of ordinary skill in the art would understand what is claimed when reading the claim in light of the specification and file history. *Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc*., 743 F.3d 1359, 1366 (Fed. Cir. 2014). The question is whether the claims, not particular claim terms, read in light of the specification and the prosecution history, inform those skilled in the art about the scope of the invention. *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP,* 838 F.3d 1224, 1231–32 (Fed. Cir. 2016).

It is clear from a reading of the patent that "hypothesis words" refers to words generated from a speech-to-text function. The '646 Patent specification discloses that as vocal input is received in real time, the system creates a series of guesses – i.e., "hypotheses" – of the words being spoken using services that convert speech to text. *See, e.g.,* Ex. 1 at 7:33-47. These hypotheses are represented as strings of text that can then be segmented in a number of ways by

a matching algorithm, down to the phonemes being uttered, a word or set of words, complete sentences, or even a full transcript of a speech sample. *See* Ex. 1 at 5:20-21 ("The matching algorithm may make a match with any number of words or phonemes received.").

Particularly, the examples in the specification disclose a "series of hypotheses of the words being spoken." Ex. 1 at 5:16-18; *see also id.* at 7:33-47. The claimed method "may be performed through a number of separate embodiments," such as receiving only one hypothesis for use as a comparison instead of a list of alternatives. *Id.* at 5:14-15; *see also,* 5:20-21 ("The matching algorithm may make a match with any number of words or phonemes received."). Once a match is found in this embodiment, a scrolling algorithm determines whether to move the text on the display, where to move it, and how fast to move it. *See id.* 12:36-13:3; Fig. 9.

Moreover, publicly-available extrinsic evidence shows that the word "hypothesis" was used around the filing date of the '646 Patent in a similar manner in relevant scholarly publications from the automatic speech recognition field and automatic translation field.  *See e.g.* Ex. 2 at § 5.2 (describing hypothesis words for voice recognition system); Ex. 3 at § 3.3 (describing hypothesis words for voice recognition systems);  Ex. 4 at 1107 (describing hypothesis words in the context of machine translation); Ex. 5 at 942 (describing hypothesis words for machine translations); Ex. 6 at §2.1 (describing hypothesis words for machine translations); Ex. 7 at 950 (describing a hypothesis for recognized speech). Each of these references use "hypothesis words" in a manner consistent with its use in the '646 Patent, namely a word that is considered a likely candidate for a spoken or communicated word.

Accordingly, both the intrinsic and extrinsic evidence establish that a person of ordinary skill would understand the meaning of "hypothesis word(s)" and thus the term is not indefinite.

G.      "altering, via said processor, said predetermined number of artifact words
        utilized for comparing to said predetermined number of hypothesis words"

| Belleau's Proposed Construction | CG3 Media's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite. |

As set forth above *supra*, when a user speaks the claimed invention generates one or more "hypothesis words" that are hypotheses about the words that a user has spoken. These words are compared against the "text artifact," *i.e.* the words of a speech on the teleprompter to find where in his/her speech the user is speaking.  Among other things the claimed invention recites modifying the number of "artifact words" (*i.e.* words in the text artifact) that are used for comparison when tracking the speaker's location.

As set forth *supra*, CG3 must prove by clear and convincing evidence that the claims are indefinite and it cannot do so here. *See Sonix Tech.* 844 F.3d at 1377 (clear and convincing evidence must be established by patent challenger to establish claims as indefinite).  The terms of the claim make clear that certain artifact words are compared against the hypothesis words generated from the speaker's voice and that the number of hypothesis words used for this comparison can be altered. Examples of this alteration are described in the '646 Patent.

For example, the '646 Patent teaches that "[t]he method may further provide for graphically presenting a section of the prewritten script to a user." Ex. 1 at 4:7-9. The visible section of the script can be further segmented in numerous ways. In one embodiment, the current speaking position of the user (or the "match location") is kept in the middle of the display, with a segment of previously spoken text above this position and a segment of text yet-to-be-spoken beneath it. *Id*. at 4:15-19. In such an embodiment, the method might preferably look only to the segment of text yet-to-be-spoken for potential matches. As match locations are found and the scrolling algorithm moves the script, the segment of words beneath the speaker's last-known

position will also change, thus requiring the "alteration" of the search area for subsequent searches to be conducted in the correct place. Ex. 1 at 6:23-27.

The '646 Patent additionally teaches that, because any number of words (or even simpler phonemes, *i.e.*, units of sound that combine to form words) can be utilized to compare to the entirety of a prewritten script, the disclosed application can limit the search according to certain variables, such as (1) the number of hypothesis words to look for (*e.g.,* a single word, two words, three words, etc.), (2) the last location on the display where a positive match was found, and (3) the bounds of the search area. *See* Ex. 1 at 5:13-28. In one embodiment, the '646 Patent teaches that four (4) hypothesis words are selected for comparison in a twenty (20) word sample from the prewritten script following the last-known positive match. *Id.* at 7:23-32.

Dependent claims 7 and 8 offer specific examples of restrictions on the number of artifact words considered for the comparison. For example Claim 7 recites that the number of words is "four or more." Ex. 1 at 16:43-44.  Claim 8 recites "retrieving twenty words of said text artifact" and "comparing, via said processor, a predetermined number of said hypothesis words to said twenty words of said text artifact." *Id.* at 16:46-50. Accordingly, the dependent claims further elucidate that varying numbers of artifact words may be considered.

This disputed term is a plain English phrase, easily understood in the context of the claim, and further illustrated in the specification and dependent claims. For that reason, the Court should reject CG3's meritless indefiniteness claim and adopt Belleau's proposed plain and ordinary meaning for this claim term.

## IV.    CONCLUSION

Belleau has offered claim constructions consistent with the plain and ordinary meaning of the terms and their use in the specification. CG3's constructions, on the other hand, are litigation-driven contrivances presented solely to avoid liability for its infringement. Belleau respectfully

requests that the Court adopt its proposed constructions.

Dated: February 22, 2022                 Respectfully submitted,
     New York, NY.

                                          By: */s/ Etai Lahav*
                                          Etai Lahav
                                          Bryon Wasserman (*pro hac vice*)
                                          **RADULESCU LLP**
                                          5 Penn Plaza, 19th Floor
                                          New York, NY 10001
                                          646-502-5950
                                          etai@radip.com
                                          bryon@radip.com

                                          ***Attorneys for Defendant/Counter-Plaintiff***
                                          ***Belleau Technologies LLC***

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/Etai Lahav*
Etai Lahav